LAWRENCE JENTZ, Respondent, v. NATIONAL CASUALTY COMPANY, a Corporation, Appellant.

(204 N. W. 344.)

**Insurance — admission of liability under policy held to amount to construction of provision regarding notice of claim.**

1. Under the terms of a health insurance policy, the insured was required to

give notice of claim within forty days of the beginning of the disability "unless such notice may be shown not to have been reasonably possible." Under the facts disclosed in the record in regard to the nature of the illness and the knowledge thereof acquired by the defendant company, an admission of liability under the policy amounts to a construction by the company of the provision regarding notice, and such construction is persuasive, if not conclusive, evidence of substantial compliance with the conditions requiring notice and proof of loss.

**Insurance — instruction that insured was able to walk from house to doctor's office for treatment, did not necessarily break continuity of confinement to house, within meaning of insurance policy, held not erroneous.**

2. The insured claimed indemnity under a paragraph in a policy providing for a stipulated rate during the time the insured is "necessarily, continuously and actually confined within the house." The court instructed the jury that the mere fact that the insured was able to walk from his house to the doctor's office, or take a railroad train to go to a hospital for treatment, did not in itself necessarily break the continuity of the confinement or the consecutiveness of the number of days he may have been confined to the house, within the meaning of the paragraph controlling indemnity for confining illness; it is *held* that, under the evidence, such instruction was not erroneous.

**Insurance — liability of insurer held not necessarily controlled by policy provision regarding chronic diseases, including rheumatism.**

3. It is *held*, under the evidence, that the disease known as torticollis does not, as a matter of law, result wholly or in part from rheumatism and that the liability of the defendant company to an insured suffering from torticollis is not necessarily controlled by the policy paragraph regarding chronic diseases.

**Evidence — evidence of lay witness as to condition of sick person held competent.**

4. It is held, for reasons stated in the opinion, that the evidence of a lay-witness, who testified to the condition of the plaintiff as observed by him, is competent.

**Trial — where action on insurance policy is submitted for special verdict, question of liability should not be submitted to jury.**

5. Where a cause is submitted for a special verdict, the question of liability should not be submitted to the jury.

**Trial — complete special verdict held not vitiated by answers to surplus questions not properly submitted.**

6. Where the jury, in response to questions, renders a complete special verdict—finding all the facts essential to the rendition of a judgment—the verdict is not vitiated by answers to surplus questions which were not prop-

52 N. D.—44.

erly submitted, the answers not being inconsistent with the answers to questions properly submitted.

Opinion filed May 26, 1925.

Appeal and Error, 4 C. J. § 2980 p. 997 n. 85.  Contracts. 13 C. J. § 517 p. 546 n. 54.  Evidence, 22 C. J. § 711 p. 619 n. 47, p. 620 n. 49.  Health Insurance, 29 C. J. § 9 p. 284 n. 7, 13, 20.  Insurance, 32 C. J. § 260 p. 1150 n. 68, 69, 70; 33 C. J. § 676 p. 22 n. 84.  Trial, 38 Cyc. p. 1909 n. 19: p. 1912 n. 31; p. 1924 n. 64.

Appeal from the District Court of Richland County, *McKenna, J.* Affirmed.

*Forbes, Lounsbury & Forbes,* for appellant.

Where the waiver relied on is the act of an agent of the insurance company, it must be shown that the agent had express authority from the company to make the waiver, or that the company subsequently, with knowledge of the facts, ratified the unauthorized action of the agent.  Liverpool & L. & G. Ins. Co. v. T. M. Richardson Lbr. Co. 69 Pac. 938.

A waiver in law is the intentional relinquishment of a known right, and the burden is upon the party claiming such waiver to prove it by such evidence as does not leave the matter doubtful or uncertain.  Aronson v. Frankfurt, A. & P. G. I. Co. 99 Pac. 537.

A waiver is the intentional relinquishment of a known right, involving both knowledge of the existence of the right, and an intention to relinquish it.  Star Brewery Co. v. Primas, 45 N. E. 145.

Whether there has been a waiver is a question of fact.  Fishback v. Van Dusen, 22 N. W. 244.

The existence of an intent to waive is a question of fact, and must be made clearly to appear.  Hopkins v. N. W. Nat. L. Ins. Co. 83 Pac. 1019; Currie v. Continental Casualty Co. 126 N. W. 164.

Since intent is an operation of the mind it should be proven and found as a fact, and is rarely to be inferred as a matter of law.  40 Cyc. 262.

The rule is settled in this state that non-expert witnesses may not express opinions that a testatrix was mentally incompetent, when they testify to no facts inconsistent with sanity.  Graves v. Northrop (Mich.) 157 N. W. 5.

Even statements to a physician which are of a purely narrative nature, are excluded. 22 C. J. 267.

The rule is well established that an offer made in an effort to compromise a cause of action cannot be legally admitted in evidence over the objection of the opposing party. Whitney v. Cleveland, 91 Pac. 176.

A fact alleged in the complaint and admitted by the answer, or, if denied by the answer, admitted on the trial, either expressly or by not challenging positive evidence which will not permit of a decision other than one way, is not a fact in controversy within any reasonable meaning of the term. Mauch v. Hartford, 87 N. W. 816.

It is the manifest aim of the special verdict statute to enable litigants to obtain the judgment of the jury as to the facts in a case, disassociated from matters of law. Olson v. Horton Motor Co. 48 N. D. 490.

A special verdict must be complete and consistent in and within itself. It must find all facts essential to sustain or defeat the cause of action in order to be sufficient to support a judgment. Dubs v. Northern P. R. Co. (N. D.) 195 N. W. 157.

A special verdict not determining all the material and controverted facts in issue is, of course, defective. Sherman v. Menomonee River L. Co. (Wis.) 45 N. W. 1079.

It is familiar law that the giving of general instructions when a special verdict is ordered is error. Morrison v. Lee, 13 N. D. 591; Olson v. Horton Motor Co. 48 N. D. 490; Ward v. Chicago, M. & St. P. R. Co. 78 N. W. 442.

Neither the constitution of the state or of the nation gives the courts the power to save any one from a valid contract. Ottumwa R. & L. Co. v. City, 173 N. W. 270.

The right of free contract is one of the inherent rights guaranteed to the citizen by our state constitution, as well as by the national Constitution. State v. Smith, 200 N. W. 65.

*Purcell & Slattery (Schneller, Heder & Schneller* of counsel), for respondent.

Contracts of insurance should be given a fair, reasonable, and sensible construction, such as, it is to be assumed, intelligent business men would give it, rather than the strained, forced, unnatural, unreasonable, or strict, technical interpretation, or one which would lead to an

absurd conclusion, or render the policy nonsensical. 32 C. J. 1151, 1152.

Contracts of insurance should be liberally construed to accomplish the purpose for which they are made. 32 C. J. 1152.

A person may be regarded as totally incapacitated and confined to his house within the meaning of a policy insuring him against sickness, notwithstanding he takes outdoor exercise by the advice of his physician, provided he is entirely incapacitated for work or business on account of his illness. It is not necessary that he be helpless, or confined to his bed or house. 14 R. C. L. 1318, and cases cited; Jennings v. Brotherhood Acci. Co. (Colo.) 18 L.R.A.(N.S.) 109, 96 Pac. 982; American Life etc. v. Mirdlinger, 113 Miss. 74, 4 A.L.R. 871, 73 So. 875.

Statements made by the insured to his attending physician on the day after the alleged accident, tending to show his bodily pain, the location of the same, and the symptoms of his malady are admissible. Patterson v. Ocean Acci. & Guarantee Co. 25 App. D. C. 46.

In insurance law waiver and estoppel are practically synonymous. 27 R. C. L. 905.

The jury are not required to find upon a fact established by undisputed evidence. Swallow v. First State Bank, 35 N. D. 608, 161 N. W. 207.

BIRDZELL, J. This is an appeal from a judgment in favor of the plaintiff and from an order denying a motion for a new trial. The action is upon a policy of insurance which provides, among other things, stipulated indemnity for illness of the insured. The facts necessary to an understanding of the questions presented on the appeal are substantially as follows: In October, 1919 the plaintiff, insured, purchased a health and accident policy of the defendant. At that time he was engaged in managing and operating a machinery business in Mantador, North Dakota as agent for one Wipperman of Hankinson. In his application he gave a negative answer to a question which called for information as to whether or not he had or ever had had rheumatism and a number of other diseases commonly regarded as chronic. In December, 1921 the insured became somewhat indisposed. On January 3rd he went to the home of his parents in Hankinson, and while

there his father called a physician, Doctor MacDonald, to attend him. At that time he was complaining that something was wrong with his neck; that he had pain. His head was turned backward and toward one side and his eyes would become locked in a given position. He was in an extremely nervous mental state. He was unable to control the muscles governing the movement of the head. The contraction which caused his head to turn backward and sidewise and his eyes to become fixed or to roll, was intermittent. The condition of the muscles affected was spasmodic. At that time Dr. MacDonald thought he had neuralgia, but on a subsequent call he diagnosed the case as torticollis. He recommended that the patient go to Minneapolis and consult Dr. Kistler, as he suspected that the trouble might be due to infected tonsils. The insured then went to Minneapolis on the 5th of January and consulted Dr. Kistler, who examined him and found everything normal except the muscles in the neck and infected tonsils. Upon Dr. Kistler's advice the plaintiff went to the Swedish Hospital where the doctor removed his tonsils and where the plaintiff remained for about five days. Doctor Kistler then advised him to go home and referred him back to Dr. MacDonald. At that time the condition of his neck was no better. Upon his return to Hankinson Dr. MacDonald recommended that he go to some place where he could get electrical treatments of some sort or treatments with an x-ray machine, as there was none in Hankinson that, in his judgment, would answer the purpose. He remained in Hankinson for about two weeks after his return from Minneapolis and then went to Fergus Falls to take treatment from a Dr. Solem. Up to this time the plaintiff had been able to walk about and had not been confined to his bed, except during the time he was recuperating from the tonsillectomy operation in Minneapolis. While at Fergus Falls he stopped at a hotel and walked to the doctor's office in the same block for treatment. He remained in Fergus Falls and received treatment for about six weeks. He then returned to Hankinson where he remained until the early part of March. He went from Hankinson to the Mayo Clinic at Rochester, Minnesota, and was examined there by Dr. Meyerding on March 13th. Dr. Meyerding confirmed the diagnosis of spasmodic torticollis. Among other treatment prescribed and administered was a plaster cast, but this proved to be impracticable and, perhaps, not beneficial, and the defendant was

discharged not materially better than when he went to the Clinic. While there he was examined by a number of doctors, one of whom, Dr. Chas. Mayo, advised an operation. It was the opinion of Dr. Meyerding that the patient was not being benefited and, as he wished to go home on March 29th, he was discharged. The plaintiff then returned to Hankinson and later, in June, went to Minneapolis to a Dr. W. A. Jones. He called upon Dr. Jones on June 14th, who confirmed the previous diagnosis and sent the patient to the Rest Hospital in Minneapolis where he remained under treatment from June 14th to July 21st, except for a period of about three days when the plaintiff went home. When he left on July 21st, he did so against the doctor's advice. The plaintiff's condition improved rather steadily and when Dr. Jones saw him in October his head and neck were in nearly a normal position with a little remaining spasm of the affected muscle.

The following are the provisions of the insurance policy that are pertinent in this case:

"Paragraph K. Indemnity for Confining Illness. At the rate of One Hundred ($100.00) Dollars per month for the number of consecutive days, but not exceeding six months, that the insured is necessarily, continuously and actually confined within the house, and therein regularly visited by a legally qualified physician, by reason of illness that is contracted and begins after this policy shall have been maintained in continuous force for thirty days from its date.

"Paragraph L. Indemnity For Non-Confining Illness. One-half of the above rate, as partial indemnity, but not exceeding two months, if immediately following said confinement, or if, by reason of sickness, beginning after this policy shall have been maintained in continuous force for thirty days from its date, the insured shall be wholly and continuously disabled (though not confined within the house), and actually attended by, or calling upon such physician professionally; provided, that this period shall not exceed two months, and the combined periods for which indemnity shall be paid for any one illness shall not exceed six (6) consecutive months.

"Paragraph M. Indemnity For Chronic Diseases. Disability or illness resulting wholly or in part from rheumatism, tuberculosis, paralysis, hernia, lumbago, sciatica, neuritis, Bright's disease, cancer, dementia, or any chronic disease, the Company's liability shall be

limited under paragraphs (K) and (L) to a period not exceeding three consecutive months, anything herein to the contrary notwithstanding.

"Paragraph P. Indemnity For Hospital Service. The indemnity otherwise payable under the provisions of paragraph (K) shall be increased twenty per cent, for such period of time, not exceeding six consecutive weeks, as the insured shall be under the treatment at a licensed hospital and also a resident therein.

"Paragraph Q. General Provisions. (2) If the insured is disabled by injury or illness for more than thirty days, he, or his representative, shall furnish the company, every thirty days, or as soon thereafter as may be reasonably possible, with a report from the attending physician or surgeon fully stating the condition of the insured.

"(6) Strict compliance on the part of the insured and beneficiary with the provisions of this policy is a condition precedent to recovery hereunder, and any failure in this respect will forfeit to the company all rights to any indemnity.

"(9) The acknowledgment by the company of the receipt of notice of claim given under this policy, or the furnishing of forms for filing proofs of loss, or the acceptance of such proofs, or the investigation of any claim hereunder, shall not operate as a waiver of any of the rights of the company in defense of any claim arising under this policy.

"Paragraph S. Standard Provisions. (4) Written notice of injury or of sickness on which claim may be based must be given to the company within twenty days after the date of the accident causing such injury or within ten days after the commencement of disability from such sickness. In event of accidental death immediate notice thereof must be given to the company."

The policy, in conformity with § 6637 of the Compiled Laws of North Dakota for 1913, contains a rider which provides in Paragraph (1) as follows:

"Notice of claim given within forty days of the occurrence of the accident or the beginning of the disability from illness upon which claim is based, unless such notice may be shown not to have been reasonably possible, shall be a compliance with the terms of the policy as to time of giving notice of claim."

On February 22, 1922 the plaintiff filled out a blank which was designated a preliminary notice of sickness. The blank was evidently

furnished by the defendant company and bears a stamped direction on its face to return to the Fargo office. It bears a received stamp of the Fargo office, February 25, 1922, and that of the home office of the company, Detroit, Michigan, April 3, 1922. In this blank the disease is described as contraction of the nerves and it is stated that the symptoms appeared about the 10th of December, 1921. The insured as his first physician Dr. Kistler of Minneapolis and the physician attending him at the time as Dr. Solem of Fergus Falls. In answer to the question as to what number of days of indemnity he would accept in full settlement, he stated "till I can go to work." Before being sent to the company, this blank had evidently been sent to Dr. Kistler who gave it as his opinion that the claimant would be totally disabled on account of this sickness from four to six weeks and attributed the original illness to infection of the tonsils. In a final statement of claim sworn to on the 22nd of November, 1922, stamped received by the Fargo office on December 16, 1922, the plaintiff claimed indemnity for seven months, claiming that he was strictly confined to the house or hospital from January 5th to August 7th, and that he was totally disabled by his sickness from January 5th to August 12th, being unable to transact his business. This was supported by attending physicians' statements signed by Drs. W. A. Jones, Henry W. Meyerding and Harold Solem. This report was made upon blanks furnished by the state agent of the defendant company at the request of the plaintiff's attorney and with the understanding that they were not to be considered as a waiver of any of the conditions of the contract. Under date of April 17, 1922, two weeks after the receipt of the preliminary notice from the Home Office at Detroit, Michigan, the state manager at Fargo wrote the plaintiff as follows:

Mr. Lawrence Jentz,
Fergus Falls, Minn.                                    # c 301270
Dear Sir:—

We received your preliminary report of sickness for rheumatism. According to the report, symptoms of your trouble appeared on the 3d of January. We were first notified of your trouble on the 22nd of February. Your policy reads that in order to draw indemnity for loss of disability, you must notify the company within 40 days from the commencement of your trouble. Your notice is very late, and un-

der the circumstances, we regret very much that we are unable to consider your claim.

We might also add that we have decided to retire from your risk, and we are returning herewith your January-September unearned premium, $28.80, and kindly ask that you do not pay any further premiums.

Yours very truly,

National Casualty Company.

D. B. Owen,

State Manager.

The check referred to in the above letter was returned to the Fargo office by the plaintiff's attorneys on September 29, 1922, who at the same time advised the state agent that the check would not be accepted and, that if the claim were not paid within a reasonable time, suit would be commenced. In answer to this letter the state agent wrote plaintiff's attorneys on October 6, 1922 as follows:

"According to our records at this office this risk was taken sick with rheumatism in December, 1921 and first consulted a physician on the 5th of January, 1922 and did not notify our company until three months after he was taken sick. Under the circumstances this office was compelled to deny liability because of the very late notice which is in conformity with policy conditions as well as the status (statutes) of North Dakota.

"In view that this office has no authority to settle claims outside of contract conditions, and further that Mr. Jentz believes that he is entitled to consideration, we can only suggest that final proofs be prepared by the claimant and his attending physician and submitted to the Home office for their consideration as to whether they wish to discriminate the conditions of their policies or not. I am therefore taking the authority of enclosing herewith final proofs to be prepared as above stated with the distinct understanding that the furnishing of these blanks will not be construed as a waiver of any conditions of contract."

On January 17, 1923 the state agent wrote the plaintiff as follows:

"We have carefully reviewed the files of proof in connection with your claim established for sickness of January the 5th, 1922. The proofs indicate that you were wholly and totally disabled and confined to the hospital under Dr. Kistler's care from January the 5th to the

10th, 5 days which at the rate of $100 per month amounts to $16.66. Under the conditions of your policy paragraph P, 'hospital services,' you are entitled to a 20% increase of monthly indemnities while a resident therein. Five days at the rate of 20% of your monthly indemnity amounts to $3.33. After January the 10th you were under the attendance of Dr. Solem a chiropractic of Fergus Falls, who established by his proofs that you made 35 office visits, to March the 1st. The fact that you went to the doctor's office for treatment obviously indicates that you were not necessarily, continuously, and actually confined within the house, which under the conditions of your policy, entitles you to the limit of the policy, 60 days for non-confinement, at the rate of 50% of your monthly indemnity. Sixty days at the rate of 50% of your monthly indemnity $100., amounts to $100, total amount $119.99, for which we tender herewith Company's draft as a full settlement and discharge of your claim."

The draft referred to in the above letter was promptly returned, whereupon the state agent again wrote, under date of January 24, 1923:

Mr. Lawrence Jentz,

Mantador, No. Dak.                                            # c 301278

Dear Sir:

This will own the receipt of your communication of the 20th in connection with your claim established for sickness of January the 5th, 1922, in which the company mailed you draft of $119.99 representing a full liability under the strict interpretations of your policy. According to policy agreement we do not understand how you can interpret a liability of $700. We note that your attorney states that he can guarantee you this amount, and in this respect I am afraid that your attorney has other vindications than facts and proofs as submitted by yourself and attending physicians.

I have again very carefully examined the evidence submitted in your claim and find that we made a correct settlement according to your contract. You were first attended by Dr. Chas. M. Kistler of Minneapolis January the 5th and was wholly and totally disabled and confined to the hospital until January the 10th. After January the 10th you were not necessarily, continuously or actually confined to the house, which evidence is substantiated by your several attending physicians, namely Dr. Solem, a chiropractor of Fergus Falls, who establishes 35

office visits from January the 20th to March the 1st, next is Dr. Meyerding of the Mayo Clinic with office visits to the clinic from the 10th of March to the 30th, then there seems to be a jump of physician services to the 14th of June when Dr. W. A. Jones of Minneapolis took the case from June the 14th to July the 21st, turning you over to Dr. MacDonald of Hankinson in which it is stated by Dr. Jones that you were still incapacitated from work but non-confined until August the 7th when you resumed your regular duties.

Now, your policy reads that in order to draw indemnity for sickness you must be wholly and totally disabled and during your period of actual and necessary confinement the Company will pay you at the rate of 100% of your monthly indemnity, and will pay you a subsequent total disability but non-confinement at the rate of 50% of your monthly indemnity, for a period of two months which is the limit of the Company's liability.

Yours very truly,
National Casualty Company.
D. B. Owen.
State Mgr.

At the conclusion of the trial the case was submitted to the jury for a special verdict, the questions having previously been submitted to counsel for criticism and approval.   The special verdict is as follows:

1. When did the disability of the plaintiff from his illness or sickness first commence?

Answer:  Jan. 5th, 1922.

2. When did the disability of the plaintiff from his illness or sickness end?

Answer:  Aug. 12, 1922.

3. When did the plaintiff's illness terminate?

Answer:  Dec. 24, 1922.

4. When did the plaintiff first notify the defendant in writing of the commencement of his disability from his illness or sickness?

Answer:  Feb. 22, 1922.

5. Did the plaintiff notify the defendant company of his illness within forty days from the commencement of his disability from his illness?

Answer:  No.

6. If your answer is "no" to the foregoing question, did the plaintiff notify the defendant in writing of his disability as soon as it was reasonably possible for him to do so under all the circumstances as disclosed by the evidence?

Answer: Yes.

7. For how many consecutive days was the plaintiff necessarily continuously and actually confined within the house and therein regularly visited by a legally qualified physician by reason of his illness?

Answer: Jan. 5, 1922 to Aug. 12, 1922.

8. For how many consecutive days was the plaintiff wholly and continuously disabled (though not confined within the house), and actually attended by, or calling upon a legally qualified physician professionally?

Answer: None.

9. How long was the plaintiff under treatment for his sickness at a hospital or hospitals as a resident of such hospital or hospitals?

Answer: Forty-seven days.

10. How many consecutive days was the plaintiff a resident of the hospital in Minneapolis, Minnesota, the first time he was confined in a hospital in that city?

Answer: Six days.

11. How many consecutive days was the plaintiff a resident of the hospital in Rochester, Minnesota?

Answer: Six days.

12. How many consecutive days was the plaintiff a resident of the hospital in Minneapolis, Minnesota, the second time he was confined in the hospital in that city?

Answer: Thirty-five days.

13. Did the plaintiff, during the period of his disability from his sickness or illness, furnish the defendant every thirty days or as soon thereafter as it was reasonably possible for him to do so, with a report from his attending physician or surgeon stating the condition of the plaintiff?

Answer: Yes.

14. If your answer to the foregoing question is "no," did the plaintiff have the different physicians who treated him make reports to the

defendant as soon as he was physically and mentally able to direct them to do so?

Answer: Yes.

15. Did the disability or illness of the plaintiff result wholly from rheumatism?

Answer: No.

16. Did the disability or illness of the plaintiff result in part from rheumatism?

Answer: No.

17. During what period of time was the plaintiff because of his illness under the professional care and regular attendance of a physician and surgeon?

Answer: All the time.

18. Is the plaintiff entitled to recover damages from the defendant?

Answer: Yes.

19. If your answer is "yes" to the foregoing question, what is the amount of damages which you deem the plaintiff entitled to recover from the defendant?

Answer: Six hundred thirty ($630.00).

We, the jury in the above entitled action find the foregoing answers in the special verdict submitted to us.

Dated at Wahpeton, North Dakota, this 22 day of February, 1924.

Mrs. Kate Hurdelbrink,

Foreman.

Upon this verdict the judgment appealed from was entered. On this appeal there are seventy specifications of error. In the opinion these specifications will be grouped for convenience in discussing the merits of the questions involved on the appeal.

It is contended that there was a breach of the condition in the policy requiring notice of the beginning of disability from illness to be given within forty days, the earliest notice being that of February 22nd. We are of the opinion, however, that the evidence presented a question of fact for the jury as to whether the notice in the instant case was sufficient. The testimony of Dr. MacDonald, the first physician consulted, was to the effect that there was considerable mental disturbance; that he was fearful that insanity might result; and the certificate of Dr. Kistler, who performed the tonsillectomy operation, would indicate

that it was his hope, if not his expectation, that the removal of the
tonsils would result in an early improvement in the condition of the
patient or a cure. He stated that the insured would only be disabled
for a period of from four to six weeks after January 5th. During the
forty-day period the patient was, part of the time, confined to his bed
and part of the time he was away from home taking treatments daily
in Fergus Falls. While he was able to walk back and forth between his
room in the hotel and the doctor's office, it is reasonable to suppose that
his attention to the improvement of his physical condition would occupy
his mind to a point where he would not be apt to concern himself with
a prompt report of his condition. But it is not necessary, in our view of
the case, to find that, in the circumstances shown here, it was not reason-
ably possible for him to comply with the forty-day statutory or policy
provision in this respect, for we are of the opinion that the defendant
company has placed its own interpretation on the measure of the plain-
tiff's compliance with this requirement. It appears in the record that be-
fore the letter of January 17th, quoted above, was written, there was on
file in the office of the company all the proofs of claim hereinabove re-
ferred to and that the chief claim adjuster had given personal attention
to the claim, and there is no evidence going to show that Owen, the state
manager or agent, did not have authority to write the letter. It will be
noted that the tender of the draft for $119.99 is not made upon the basis
of its being a compromise of any claim. On the contrary, the letter pur-
ports to state exactly the defendant's liability *under the policy*. It item-
izes the various benefits to which the policy holder is entitled under the
facts, as viewed by the company, and offers to discharge the full lia-
bility to the penny. It is not contended in the letter that the company
is not liable on account of the failure to give notice, and the settlement
offered is one, to use the language of the agent, "under the conditions
of your policy." If the present contentions of the defendant are cor-
rect, there never was any liability under the policy. The time limita-
tion in the contract is not absolute; it is qualified by considerations of
reasonable possibility. Under all the facts which were before the com-
pany when the letter of January 17, 1923 was written, there was ample
room to regard the qualification as applying. Facts were before it
from which it might well have concluded that it was not reasonably
possible for the plaintiff to have notified it within the forty-day period.

If it concluded from those facts that the notice was in time, it placed its own construction upon the policy. Its action in offering to pay the full amount, under its construction of the policy, is persuasive, if not conclusive, evidence of the substantial compliance by the assured with the conditions respecting notice and proof of loss. Where a contract is uncertain or ambiguous in its terms, as applied to a given situation arising during its operation, and the parties themselves have placed an interpretation upon it, generally such interpretation will be adopted by the court. 2 Williston, Contr. 1206, § 623. In the circumstances present here, we are clearly of the opinion that the defendant was not prejudiced by the submission of question 6 to the jury.

There is considerable argument in the brief of the appellant to the effect that the plaintiff has not relied, and in fact had no right to rely, upon the letter of January 17th to his prejudice and, hence, that that letter can not operate as a waiver of the conditions of the policy. 33 C. J. 22. We express no opinion as to whether or not the latter might amount to a waiver. Upon this question the authorities are in hopeless conflict. 33 C. J. 22, supra. As this is not a case where there has been a clear breach of any absolute condition in the policy, we do not feel called upon to decide that question. It is rather, we think, a case of substantial compliance with the terms and conditions of the policy, recognized as such by the defendant in whose favor a more strict construction of the provision would operate.

What is said above applies equally to the contention that the defendant is not liable by reason of the failure of the plaintiff to furnish reports from the attending physician every thirty days during the continuance of the illness or as soon thereafter as may be reasonably possible under Paragraph Q (2) of the General Provisions of the policy. Also, to the contention that the final proof was not made within ninety days from the termination of the period for which the company was liable.

The further contention is made that under the policy the maximum benefit recoverable can not, in any event, exceed three consecutive months' indemnity, because it is alleged in the complaint that on or about the 3rd day of January, 1922 the plaintiff became afflicted with a disease or ailment of rheumatism or a disease or ailment of a similar nature as informed by his physicians. The pleading does not definitely

declare the disease in question to have been rheumatism. There is some testimony on the part of the physicians indicating a kinship or connection between the disease of torticollis and rheumatism in some of its forms, and that the two generally have in common the causal element of infection of some sort. However, we think the argument of counsel in this respect is adequately answered by Dr. Pilcher, the consulting physician or medical director of the defendant company. He testified that frequently a case of torticollis develops where the patient has had no prior rheumatic trouble and that where this was the case he would look upon it as a symptom of infection somewhere, or a pressure somewhat, and that when the infaction or pressure is relieved the torticollis should be cured. His testimony is indeed commendably frank in its description of the character of this disease, and it does not conflict with the testimony of the doctors who, from time to time, were called upon to treat the plaintiff, none of whom, however, regarded his condition as due to rheumatism. On this subject Dr. Meyerding testified that when the plaintiff was examined at the Mayo Clinic the condition found was spasmodic torticollis, and he stated that he did not know the cause of spasmodic torticollis; that there had been theories but he did not believe that the cause had been definitely established. He further stated that the disease was a disorder of the neuro-muscular system; that he did not believe it was allied with rheumatism. The other medical testimony is to the same general effect. In view of this evidence, we think there is no merit in the contention that the benefits are limited, as a matter of law, to three months under Paragraph M of the policy, which refers to an indemnity for chronic diseases including rheumatism.

Upon the trial there were objections to the testimony of Wipperman, the employer of the plaintiff, wherein, referring to a visit he paid to the plaintiff when he first became ill in January, he testified that he had a twitching of the neck to one side and in an upward direction and that his eyes were "popping out" and that "he had a strange look on him;" that the greatest change he saw later when the plaintiff came back from Rochester was that he was in awful agony; that his head was practically square with the shoulder and that when he would turn his head to its natural position (the witness indicated, probably with the use of his arms) it would "jump" right back; that while his conversation

was such that he could understand what he meant, he could see that there was a change; that he was in no shape to take care of the business up to the first part of August; and that he was not fit to take care of any business at that time. It is urged that this evidence is inadmissible in that it embraces observations and conclusions of a layman who is not qualified as an expert to testify to a physical or mental condition. The observations of the witness do not seem to us to transcend the legitimate bounds for a lay-witness. This witness had been intimately acquainted with the plaintiff for many years and his observations of the plaintiff, soon after he became ill, would create a more definite impression of an existing abnormal condition than as though he had not been previously acquainted with him. These impressions as they would naturally be carried in his mind would be so intimately associated with his observations that they could scarcely be distinguished in his efforts to convey to the jury the condition as he saw it. . For the most part the testimony consisted, as will be seen, of a description of the appearance of the plaintiff. In so far as a conclusion was expressed as to whether the plaintiff was able to work or take care of business, we think the statement is not prejudicial in view of the general agreement of the doctors that the condition of the plaintiff was such that he should have been occupied during all this period with efforts to effect a cure of his ailment, lest it become chronic or incurable.

Appellant assigns errors in the submission of the questions for a special verdict and in the instructions of the court. Among other contentions, it is claimed that the court erred in submitting the 18th question as follows: "Is the plaintiff entitled to recover damages from the defendant?" and the 19th question as follows: "If your answer is 'yes' to the foregoing question, what is the amount of damages which you deem the plaintiff entitled to recover from the defendant?" It is said that the answers to these questions amount, substantially, to a general verdict and that where a case is submitted to a jury for a general verdict they should be fully instructed upon the law applicable to the case instead of being instructed merely in such a manner as to facilitate the proper answering of the questions submitted. The questions are clearly open to the criticism made. The special verdict should, of course, be limited to questions of fact, so that from the answers it will be possible for the

court to apply the law and enter a judgment that will reflect the application of the law to the facts of the particular case. In the instant case, however, the special verdict is complete without the 18th or 19th questions, and the answers to these are such as the court would have been compelled to make under the law, upon the findings of fact by the jury in response to the 17 questions. Whatever the effect might have been, had the jury answered the 18th and 19th questions differently, we are clear that where the verdict is complete without answers to the improper questions, and where no repugnancy exists—the answers being consistent with the remaining findings of fact—they may properly be rejected as surplusage. This leaves the special verdict standing, and, it having been reached upon appropriate instructions, it should not be disturbed.

The appellant complains, however, that the court erred in instructing the jury upon the 7th question, which called for an answer as to the number of consecutive days the plaintiff was necessarily, continuously and actually, confined within the house. The court said: "In arriving at your answer to that question, the court advises you that you must give a fairly liberal construction to the phrase 'consecutive and continuous.' The court charges you that merely because a man is able to walk from his house to the doctor's office for treatment, or the mere fact that he may be able to take the railroad train to go to the hospital for treatment does not in itself necessarily break the continuity of the confinement to the house or the consecutiveness of the number of days he may have been confined to the house, but that is a circumstance which you may take into consideration in arriving at an answer to that question." In our judgment, this is a common sense construction of the contract, and there was no error in stating it to the jury for their guidance. Under the evidence in this case, the instruction was appropriate. The evidence shows that the plaintiff was confined to the hospital in Minneapolis on one occasion for several weeks and that he was confined to his bed at his mother's house for two weeks; that when he was away for treatment or being treated at home he did not go about seeking recreation but, rather, that he was at all times under close restraint and confinement, and that this was necessary to facilitate the treatment which, it was hoped, would restore him to health.

It is impossible to consider the specifications of error seriatim. We have carefully examined the transcript and the exhibits and have noted

all of the assignments argued in the brief of the appellant. In the foregoing opinion, we have discussed those that seem to have the greatest merit. On the whole record we are satisfied that a fair trial has been had and that no prejudicial error has been committed. It follows that the judgment and order appealed from must be affirmed; it is so ordered.

CHRISTIANSON, Ch. J., and BURKE, JOHNSON, and NUESSLE, JJ., concur.